UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| AHERN RENTALS, INC., | Case No. 2:21-cv-02190-ART-BNW |
| Plaintiff, | ORDER |
| v. | |
| JOHN MATTHEW YOUNG, | |
| Defendant. | |

This dispute centers on the enforceability and alleged breach of certain restrictive covenants in the employment agreement between Plaintiff Ahern Rentals, Inc., and Defendant John Matthew Young. This case began as two separate state court actions. One, filed by Defendant against Plaintiff, originated in North Carolina state court, and was subsequently removed to federal court in North Carolina and then transferred to the District of Nevada. The other, filed by Plaintiff against Defendant, originated in Nevada state court, and was subsequently removed to this Court. The cases were ultimately consolidated into this action. (ECF No. 54.)

Now pending before the Court are several motions from both parties. Defendant has moved for summary judgment on both his own claims and Plaintiff's claims. (ECF No. 63.) Plaintiff has responded with two motions for summary judgment, one related to its own claims (ECF No. 65), and the other on Defendant's claims (ECF No. 68). Related to these cross motions for summary judgment are three motions to seal documents. Two were filed by Plaintiff (ECF Nos. 66, 69), and the other was filed by Defendant (ECF No. 76). Finally, Defendant filed two motions for leave to file a document to supplement his prior briefing on the summary judgment motions. (ECF Nos. 87, 88.)

Good cause appearing, the Court grants each of the motions to seal. (ECF Nos. 66, 69, 76.) For the reasons stated, the Court denies Defendant's two motions for leave to file supplements to his summary judgment briefing. (ECF

Nos. 87, 88.) For the reasons stated, the Court grants Plaintiff's motion for summary judgment on Defendant's claims. (ECF No. 68.) The remaining motions for summary judgment are each granted in part and denied in part, as outlined below. (ECF Nos. 63, 65.)

## I. Facts

At all times relevant to the motions before the Court, Plaintiff Ahern Rentals, Inc., rented heavy industrial and construction equipment to customers in a variety of industries. (ECF No. 1-1 ("Complaint"); ECF No. 5-2 ("Vawter Declaration").) Defendant John Matthew Young started working for Plaintiff in August 2019 as a sales representative at Plaintiff's branch in Raleigh, North Carolina. (ECF No. 63-1 ("Young Declaration"); ECF No. 63-2 ("Ahern Rule 30(b)(6) Deposition").) As part of the hiring process, Defendant entered into a Non-Competition, Non-Solicitation and Non-Disclosure Agreement ("Agreement") with Plaintiff. (ECF No. 65-6.) The Agreement provides that it "shall be governed and construed in accordance with the laws of the State of Nevada." (Agreement at § 8.1.) This litigation centers on four provisions in the Agreement.

First, the Agreement contains a non-solicitation provision:

> 2.1. Employee covenants that during the period that he/she is employed by Company and thereafter for the 12-month period immediately following the date on which Employee's employment with Company is terminated . . . he/she will not . . . except on behalf of the Company, directly or indirectly:
> A. attempt in any manner to solicit from any Customer . . . business of the type performed by Company or to persuade any Customer to cease to do business or to reduce the amount of business which any such Customer has customarily done or is reasonably expected to do with Company, whether or not the relationship between such member of Company and such client was originally established in whole or in part through his/her efforts;

(Agreement at § 2.1.) The Agreement defines "Customer" as used in the non-solicitation agreement:

(A) any person or entity who is a customer of Company on the Date of Termination; (B) any person or entity who was a customer of Company at any time during the one-year period immediately preceding the Date of Termination; (C) any prospective customers to whom Company made a new business presentation (or similar offering of services) at any time during the two-year period immediately preceding the Date of Termination; and (D) any prospective customer to whom Company made a new business presentation (or similar offering of services) at any time within six months after the Date of Termination (but only if the initial discussions between Company and such prospective client relating to the rendering of services occurred prior to the Date of Termination, and only if employees of Company participated in such discussion or the preparation of such solicitation).

(Agreement at § 2.3.)

Second, the Agreement includes a non-competition provision:

If the Employee's employment with the Company is terminated . . . whether or not such termination is initiated by the Company or by the Employee, Employee covenants that during the period that he/she is employed by Company and thereafter for the 12-month period immediately following the Date of Termination, he/she will not, as an individual, consultant, partner, member, shareholder, independent contractor, representative, or otherwise, or in association with any other person, business or enterprise, except on behalf of Company, directly or indirectly, be employed, retained or otherwise provide any consulting, contracting, sales or other services that are the same or similar services that Employee provided at the Company to any person or entity who or which then competes with Company to any extent within the Restricted Area.

(Agreement at § 2.2.) The Agreement defines "Restricted Area" as used in the non-competition provision:

The "Restricted Area" shall consist of a 100 mile radius of any of Company's stores in or for which Employee performed services, or had management or sales responsibilities at any time during the 12-month period immediately preceding the Date of Termination and in which the Company has established customer contacts and good will.

(Agreement at § 2.4.) Relevant to both the non-solicitation and non-competition provisions is a term providing how time periods in the Agreement are computed:

All time periods in this Agreement shall be computed by excluding from such computation any time during which Employee is or was

in violation of any provision of this Agreement and any time during which there is pending in any court of competent jurisdiction any action (including any appeal from any final judgment) brought by any person or entity, whether or not a party to this Agreement, in which action Company seeks to enforce the agreements and covenants in this Agreement or in which any person or entity contests the validity of such agreements and covenants or their enforceability or seeks to avoid their performance or enforcement.

(Agreement at § 2.5.)

Third, the Agreement includes a non-disclosure provision:

Employee shall not at any time: (A) disclose any Confidential Information or Trade Secret without the express written consent of Company; (B) utilize any Confidential Information or Trade Secret for his/her own benefit, or for the benefit of any third party; or (C) remove or take personal possession of any Confidential Information or Trade Secret from Company's premises, systems, servers, or other location, physical or electronic, without the express written consent of Company. Employee acknowledges and agrees that all memoranda, manuals, reports, plans, designs, notes, records and other documents compiled or produced by him/her or made available to him/her pertaining to the business of Company and/or the Customers (whether or not the same constitutes Confidential Information or a Trade Secret), shall be and remain the property of Company, shall remain subject at all times to Company's sole discretion and control, and all originals and copies of the same shall be delivered immediately to Company on the Date of Termination or, upon request, at any other time.

(Agreement at § 3.2.) Section 3 of the Agreement includes additional terms bearing on the non-disclosure provision. For example, "Employee acknowledges and agrees that the Confidential Information and Trade Secrets constitute valuable goodwill of Company and are owned, and shall continue to be owned, solely by Company and/or customers." (Agreement at § 3.1.) The Agreement defines "Confidential Information" as "any information . . . that is not generally known to the public, including, but not limited to . . . agreements and/or contracts with Customers . . . Customer preferences . . . and information about or received from Customers and other entities with which Company does business." (Agreement at § 3.4.) "Trade Secrets" are defined as information

which "Company derives independent economic value, actual or potential, from," is "not generally known to, and is not readily ascertainable by, persons who can obtain economic value from its disclosure or use," and is "the subject of Company's efforts to maintain its secrecy that are reasonable under the circumstances, regardless of whether such information may be protected as a trade secret under applicable law." (*Id.*) Finally, the Agreement provides that employees must return all documents containing Confidential Information and Trade Secrets and cease accessing any of the Company's computers and other equipment no later than the date of termination. (Agreement at § 3.5.)

Fourth, the Agreement provides for liquidated damages:

> Employee agrees that in the event of a breach of any terms of this Agreement . . . the damages will be difficult if not impossible to ascertain. It is therefore agreed that if Employee commits a breach or, in Company's reasonable judgment, is about to commit a breach, . . . Company shall be entitled to: . . . liquidated damages in the amount of TWO HUNDRED FIFTY THOUSAND DOLLARS AND 00/100THS ($250,000.00). The Parties agree that the liquidated damages provision provided for herein are reasonable in amount and not a penalty. In addition, Company may take all such other actions and remedies available to it under law or in equity and shall be entitled to such money damages insofar as they can be reasonably determined, including, without limitation, all reasonable costs and attorneys' fees (including those of Company's in-house attorneys) incurred by Company in enforcing the provisions of this Agreement.

(Agreement at § 5.) The Agreement is signed and dated by Defendant and Defendant's manager.

The parties disagree over the geographic scope of Defendant's sales responsibilities while he was an employee of Plaintiff's. According to Defendant, his employment "was account focused and based exclusively out of Ahern's branch in Raleigh, North Carolina," and his "area of responsibility was Southwest Raleigh." (Young Declaration at ¶ 4.) In his deposition, Defendant states that he never worked at Plaintiff's Charlotte branch. (ECF No. 63-3 ("First

Young Deposition") at 79-80.)

Plaintiff characterizes Defendant's sales responsibilities differently. According to Plaintiff, Ahern does not use a territory-based model but assigns its sales representatives an account base. (Ahern Rule 30(b)(6) Deposition at 12-13.) Because of Ahern's model, sales representatives are expected to serve customers across the country. (*Id.*)

The record reflects that Defendant served customers in North Carolina, South Carolina, Texas, Georgia, Minnesota, Oregon, and California. (*Id.* at 14-15.) Defendant testified that he rented equipment to Sky View Steel, MTZ Welding, and Cubas Welding while at Ahern. (First Young Deposition at 20-25.) The record also reflects that Defendant served customers located in Charlotte, North Carolina, and rented equipment for jobsites in Charlotte to customers situated in other states. (ECF No. 67-2; ECF No. 67-3; ECF No. 67-6; First Young Deposition at 44-45.) Defendant testified that he only visited Ahern's Charlotte store two or three times during his employment with Ahern. (First Young Deposition at 79-80.) Plaintiff's records reflect that less than 1% of the 316 customers Defendant serviced while at Ahern were located in Charlotte. (ECF No. 63-7.)

In August of 2020, Defendant was involved in a verbal dispute with his manager and frustratedly stated that he might leave the company and take his revenue with him. (ECF No. 65-20; First Young Deposition at 56-57.) Defendant signed a record of the conversation that Ahern created and did not dispute the record. (ECF No. 65-20.) In the months following this dispute, Defendant began communicating with one of Plaintiff's competitors, JGR Equipment Rentals and Sales ("JGR"), about potential job opportunities. (First Young Deposition at 56-57.)

In March of 2021, Defendant was involved in another verbal conflict with Ahern management. (First Young Deposition at 58-59, 76-77; Young

Declaration at ¶ 6.) According to Defendant, Ahern's regional vice president solicited feedback on how Ahern could improve its business operations; after Defendant described areas for improvement, he was told that Ahern may not be the best place for him to work. (*Id.*) Following this conflict, Defendant began speaking with an employee of an Ahern competitor, EquipmentShare, about employment opportunities. (ECF No. 65-23 ("Second Young Deposition") at 45; ECF 65-24 ("Foster Deposition") at 34-36.)

Defendant took several other relevant actions following the March conflict. In a declaration, Defendant states that he requested a copy of his Non-Competition Agreement with Ahern to ensure that he was complying with all restrictive covenants. (Young Declaration at ¶ 7.) Young also created a 103-page list of potential customer targets by taking screenshots of customer information for every active Ahern customer in North Carolina. (First Young Deposition at 63-67, 75-77; ECF No. 67-7.) Defendant testified that the screenshots came from Ahern's password protected database. (First Young Deposition at 63-67, 75-77.) Defendant emailed this list to his personal email address. (*Id.*) Defendant emailed several additional documents from Ahern's database throughout the course of March 2021. (ECF No. 67-8; ECF No. 67-9; ECF No. 67-10; ECF No. 67-11.)

After reviewing the Non-Competition Agreement, Defendant began exploring employment opportunities in the equipment rental industry in Charlotte, which was more than 100 miles away from Ahern's Raleigh location. (Young Declaration at ¶ 7-9.) Defendant eventually received an employment offer from JGR Equipment Rental & Sales as a sales representative in its Charlotte branch. (First Young Deposition at 57-58, 66; ECF No. 65-21.) In anticipation of accepting this offer, Defendant provided Plaintiff with two-weeks' notice of his resignation. (Young Declaration at ¶ 9; ECF No. 65-29) Ater receiving Defendant's notice, Plaintiff terminated Defendant's employment

effective immediately. (Young Declaration at ¶ 9.) Plaintiff then sent letters to Defendant and JGR describing the scope of the restrictive covenants in Plaintiff's contract with Ahern. (Young Declaration at ¶ 9; ECF No. 65-30.) After delivery of these letters, Defendant's employment with JGR never materialized. (Young Declaration at ¶ 9.)

Around the same time Defendant's employment with JGR fell apart, EquipmentShare contacted Defendant to gauge his interest in working for a branch in Charlotte that EquipmentShare was planning to open in the future. (First Young Deposition at 14; Foster Deposition at 46-48, 115.) Defendant received an official offer of employment to become a sales representative at EquipmentShare after he provided EquipmentShare with the Non-Competition Agreement. (Foster Deposition at 49-54.) Upon acceptance of the offer from EquipmentShare, Defendant was instructed to refrain from going after his former customers at Ahern, from using any of Ahern's information, and from otherwise violating the Non-Competition Agreement. (Foster Deposition at 57-58.)

Defendant began working for EquipmentShare on May 28, 2021. (Young First Deposition at 14.) At the time, EquipmentShare did not have a Charlotte location, and Defendant was technically assigned to EquipmentShare's location near Charleston, South Carolina, more than 100 miles from Ahern's Raleigh store. (Foster Deposition at 115; Second Young Deposition at 30.) Defendant primarily worked remotely out of his Charlotte apartment. (Second Young Deposition at 30; Young Declaration at ¶ 9.)

The parties have starkly different versions of the events that took place in the weeks after Defendant began working at EquipmentShare. Plaintiff contends that Defendant directly solicited seven of his former customers from his time at Ahern: Queens Welding, Cubas Welding, Environmental Holdings Group, Sky View Steel, MTZ Welding, ARS Extreme Construction, and Phoinix

Construction. (ECF No. 65 at 16-19.) Defendant contends that while Cubas Welding, MTZ Welding, and Sky View Steel were former customers of his at Ahern, he did not directly solicit any of them, and that all three of the companies contacted him first once he began working for EquipmentShare. (ECF No. 63 at 8-11.) Defendant also argues that contact with Environmental Holdings Group and Phoinix Construction were both initiated by the customers, that contact with ARS Extreme Construction did not amount to solicitation, and that Queens Welding was not a customer of his at Ahern. (ECF No. 73 at 17 n.5.)

On August 31, 2021, Plaintiff's general counsel emailed EquipmentShare's general counsel alleging that Defendant's employment with EquipmentShare violated the Non-Competition Agreement. (Second Young Deposition at 80-83; ECF No. 63-11.) Further, Plaintiff alleged that Defendant had solicited Ahern customers on behalf of EquipmentShare. (ECF No. 63-11) In response to Plaintiff's allegations, EquipmentShare suspended Defendant without pay in early September 2021. (*Id.*)

Following the suspension, Defendant filed suit in North Carolina state court challenging the enforceability of the restrictive covenants in the Non-Competition Agreement. (ECF No. 63-12.) Plaintiff commenced this litigation against Young in Nevada state court asserting claims for (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) conversion; (4) violation of the Nevada Trade Secrets Act; and (5) injunctive relief. (ECF No. 1-1.) Both cases were removed to federal court, the North Carolina case was transferred to Nevada, and then both were ultimately consolidated into this action. (ECF Nos. 52, 54.)

Initially, Plaintiff sought a temporary restraining order (ECF No. 5), which this Court granted (ECF No. 13), finding good cause to believe Defendant breached his agreement with Plaintiff. Plaintiff's request for a preliminary

injunction (ECF No. 6) was granted in part and denied in part, with the Court enjoining Defendant from violating the non-disclosure provision but finding no threat of irreparable harm from other alleged breaches given Defendant's suspension at Ahern (ECF No. 45).

Defendant then filed his motion for summary judgment, both on his claims and on Plaintiff's. (ECF No. 63). Plaintiff responded (ECF No. 72), and Defendant replied (ECF No. 78.).

Plaintiff filed two summary judgment motions, one on its own claims (ECF No. 65), and one on Defendant's claims (ECF No. 68). Defendant responded to both motions (ECF Nos. 73, 77). Plaintiff filed a consolidated reply (ECF No. 82).

Related to these cross motions for summary judgment are three motions to seal documents. Two were filed by Plaintiff (ECF Nos. 66, 69), and the other was filed by Defendant (ECF No. 76).

Finally, Defendant filed two motions for leave to supplement his oppositions to Plaintiff's motions for summary judgment (ECF Nos. 87, 88). Plaintiff responded (ECF No. 90), and Defendant replied (ECF No. 91, 92).

## II.    Summary Judgment Standard

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the

non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000); *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."). The Court views the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008). "When simultaneous cross-motions for summary judgment on the same claim are before the Court, the Court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citation omitted).

### III.   Analysis

### 1. Summary Judgment on Plaintiff's Claims

In his motion for summary judgment, Defendant argues that he is entitled to summary judgment on Plaintiff's breach of contract and breach of the covenant of good faith and fair dealing causes of action related to the non-competition and non-solicitation provisions for two reasons: the provisions are overly broad and therefore unenforceable and, even if the provisions are enforceable, Defendant did not violate them. Defendant further argues that he is entitled to summary judgment on Plaintiff's breach claims based on the breach of the non-disclosure provision because Plaintiff has failed to present evidence of damages. According to Defendant, the lack of evidence of damages also should result in summary judgment in his favor on the conversion and violation of the Nevada Trade Secrets Act claims. Finally, Defendant argues that the liquidated damages clause is an unenforceable penalty and that he is entitled to summary judgment on his affirmative defense on this issue. (ECF

Nos. 63, 73, 78.)

In response, Plaintiff contends that the non-competition and non-solicitation provisions are valid and enforceable, and that Defendant breached them through his employment with EquipmentShare and his alleged solicitation of Ahern customers. Plaintiff also argues that summary judgment is proper in its favor for breach of the non-disclosure provision, conversion, and violation of the Nevada Trade Secrets Act. Finally, Plaintiff argues that the liquidated damages clause is valid and enforceable. (ECF Nos. 65, 72, 82.)

As explained below, the Court finds the non-competition and non-solicitation provisions overbroad. But because Nevada law requires courts to revise a restrictive covenant when possible, the Court will revise each of these covenants to not impose undue hardship on Defendant. After revising each of these provisions, the Court grants summary judgment for Defendant as to the breach of the non-competition provision. The Court finds triable issues of fact as to whether Defendant breached the revised non-solicitation provision. The Court also finds triable issues of fact as to damages flowing from Defendant's breach of the non-disclosure provision and as to damages resulting from Plaintiff's claims for conversion and violation of the Nevada Trade Secrets Act. Finally, the Court finds the liquidated damages clause to be an unenforceable penalty and grants summary judgment on Defendant's affirmative defense related to that issue.

### a. Contract Claims

The Agreement provides that it "shall be governed and construed in accordance with the laws of the State of Nevada." (Agreement at § 8.1.) In Nevada, "the plaintiff in a breach of contract action [must] show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919–20 (D. Nev. 2006) (citing *Richardson v. Jones*, 1 Nev. 405, 408 (1865)). To establish a

claim for breach of the implied covenants of good faith and fair dealing, a plaintiff must prove: (1) the existence of a contract between the parties; (2) that defendant breached its duty of good faith and fair dealing by acting in a manner unfaithful to the purpose of the contract; and (3) the plaintiff's justified expectations under the contract were denied. *See Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1251 (D. Nev. 2016) (citing *Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995)). A party breaches the implied covenants of good faith and fair dealing by engaging in conduct that "deliberately countervenes the intention and spirit of the contract." *Id.* (quoting *Hilton Hotels Corp., v. Butch Lewis Prod. Inc.*, 808 P.2d 919, 923-24 (Nev. 1991)).

Plaintiff has alleged breach of contract and breach of the implied covenants of good faith and fair dealing claims against Defendant related to three provisions in the Agreement: 1) the non-competitions provision; 2) the non-solicitation provision; and 3) the non-disclosure provision. Both Plaintiff and Defendant have moved for summary judgment on these claims. Neither party contests that existence of a valid contract, so the Court will only address breach and damages and address each of the breach claims in turn.

### i. Breach of the Non-Competition Provision

Covenants to not compete are governed by NRS 163.195. Such covenants are "void and unenforceable" unless they are "supported by valuable consideration," do not "impose any restraint that is greater than is required for the protection of the employer for whose benefit the restraint is imposed," do not "impose any undue hardship on the employee," and are "appropriate in relation to the valuable consideration supporting the noncompetition covenant." NRS 163.195(1)(a-d). The statute also provides that if a court finds that a restrictive covenant is unreasonable or imposes undue hardship on the employee, "the court shall revise the covenant to the extent necessary and enforce the covenant as revised." NRS 163.195(6).

The statutory language mirrors Nevada Supreme Court cases discussing restrictive covenants. "An agreement on the part of an employee not to compete with his employer after termination of the employment is in restraint of trade and will not be enforced in accordance with its terms unless the same are reasonable." *Hansen v. Edwards*, 426 P.2d 792, 793 (Nev. 1967).  The test for reasonableness of a restrictive covenant boils down to "whether it imposes upon the employee any greater restraint than is reasonably necessary to protect the business and good will of the employer." *Id.* "A restraint of trade is unreasonable . . . if it is greater than is required for the protection of the person for whose benefit the restraint is imposed or imposes undue hardship upon the person restricted." *Id.* "The amount of time the covenant lasts, the territory it covers, and the hardship imposed upon the person restricted are factors for the court to consider in determining whether such a covenant is reasonable." *Jones v. Deeter*, 913 P.2d 1272, 1275 (Nev. 1996). "[B]ecause the loss of a person's livelihood is a very serious matter, post employment anti-competitive covenants are scrutinized with greater care." *Ellis v. McDaniel*, 596 P.2d 222, 224 (Nev. 1979). If a restrictive covenant is found to be unreasonable, it is unenforceable, and therefore cannot be breached. *Jones*, 913 P.2d at 1275.

The reasonableness test must be applied to three elements of the non-competition provision at issue here: the duration, the scope of activity, and the territory covered. Beginning with duration, the Agreement states that the non-competition restrictions apply "for the 12-month period immediately following the Date of Termination." (Agreement at § 2.2.) Generally, a one-year period for restrictive covenants is reasonable. *See Ellis*, 596 P.2d at 224 (finding a duration of two years reasonable); *Hansen*, 426 P.2d at 794 (finding a duration of one year reasonable). Thus, the Court finds the one-year term of duration for the non-competition provision of the Agreement to be valid and enforceable.

The Agreement also restricts Defendant from engaging in certain activities

and behavior. Specifically, it provides that Defendant "will not . . . directly or indirectly, be employed, retained or otherwise provide any consulting, contracting, sales or other services that are the same or similar services that Employee provided at the Company to any person or entity [that] competes with Company . . . within the Restricted Area." (Agreement at § 2.2.) As written, this provision is unreasonable and places an undue hardship on Defendant because it restricts Defendant from all employment with Ahern competitors, not just employment providing "services that are the same or similar services" that Defendant provided to Ahern.

The Nevada Supreme Court found a similar restriction unreasonable in *Golden Rd. Motor Inn, Inc. v. Islam*, holding that a term prohibiting *all* employment in an industry was overly broad because "it extends beyond what is necessary to protect [the employer's] interests." 376 P.3d 151, 155 (Nev. 2016), *superseded by statute on other grounds*, NRS 613.195(6), *as recognized in Tough Turtle Turf, LLC v. Scott*, 537 P.3d 883, 886–87 (Nev. 2023). The Nevada Supreme Court also found that the restriction placed an undue hardship on the employee because it "severely restrict[ed] [his] ability to be gainfully employed." *Id.*

Because the restriction here, just like in *Golden Rd.*, prohibits Defendant from all employment with competitors in the Restricted Area, the Court finds that it is unreasonably broad. Under NRS 613.195(6), a "district court must modify an overbroad noncompete covenant when possible." *Tough Turtle Turf*, 537 P.3d at 887. Here, the offending language may easily be stricken from the non-competition provision to cure the overbreadth. The Court therefore strikes the words "be employed, retained or otherwise" that follow the word "indirectly" and precede the word "provide" in Section 2.2 of the Agreement. This revision relieves the undue hardship on Defendant and reasonably protects Plaintiff's business interests. Under this revision, Defendant may pursue employment

with Ahern competitors in the Restricted Area only if the employment is not related to the same services he performed for Ahern.

Finally, the geographic scope of the restriction consists of "a 100 mile radius of any of Company's stores in or for which Employee performed services, or had management or sales responsibilities at any time during the 12-month period immediately preceding the Date of Termination and in which the Company has established customer contacts and good will." (Agreement at § 2.4.) As written, this restriction would appear to prohibit Defendant from working as sales representative within 100 miles of any Ahern store that Defendant sold rental equipment from during the 12-month period immediately preceding his termination. Importantly, this includes more than just the Raleigh branch where Defendant was assigned; it includes every store across the country that serviced Defendant's clients on contracts Defendant sold. It appears from the record that the Restricted Area therefore includes area in over twenty states, including states far from North Carolina like California, Minnesota, and Oregon. (ECF No. 63-7; Ahern Rule 30(b)(6) Deposition at 12-15.) The Court finds that the geographic scope of this restriction is not necessary to protect Plaintiff's business interests and places undue hardship on Defendant. It is thus overbroad and unenforceable.

Plaintiff, unlike other rental companies, assigns customers to its sales representatives and provides its employees with considerable amounts of confidential information and trade secrets about their assigned customers. (Ahern Rule 30(b)(6) Deposition at 12-15, 23, 33.) Sales representatives develop a rapport with specific entities, learn the intricacies of an entity's operations and its specific needs, and may service that entity in many cities across the country. (*Id.*) Plaintiff's stated business interests are adequately protected by other restrictive covenants in the Agreement prohibiting direct solicitation of Ahern customers and the use of Ahern confidential information. The geographic

scope is therefore unnecessary to protect Ahern's business interests considering the Agreement as a whole.

The geographic scope also severely restricts Defendant's ability to be gainfully employed. *See Golden Rd. Motor Inn, Inc.*, 376 P.3d at 155. Defendant would need to either leave his chosen industry and profession or move far from his home to a narrow choice of states. Given that Plaintiff's business interests are adequately protected by other provisions of the Agreement, the undue hardship the geographic scope places on Defendant is unreasonable. The geographic scope is therefore overbroad and unenforceable.

As above, this Court is tasked by statute with revising the overbroad geographic scope. NRS 613.195(6). A reasonable revision here must both relieve the undue hardship on Defendant and be no greater than necessary for the employer's protection. Limiting the geographic scope to a 100-mile radius surrounding Raleigh, the location where Defendant was physically present and rented the highest percentage of equipment relative to other locations, removes the undue hardship on Defendant. It also protects Plaintiff's business interests by ensuring that Defendant will not compete with it in the area where Defendant's connections with Ahern customers are most developed and most likely to harm Ahern's business interests. The Court therefore revises Section 2.4 of the Agreement to read "a 100 mile radius of any of Company's stores where Employee was assigned at any time during the 12-month period immediately preceding the Date of Termination."

The question remaining is whether there are any triable issues of fact as to whether Defendant breached the revised non-competition provision. There is no dispute that Defendant sought employment providing the same services he provided at Ahern within twelve months of his termination at Ahern. There is also no dispute that Defendant's employment was more than 100 miles from Ahern's Raleigh, North Carolina branch. Defendant is therefore not in breach of

the revised non-competition provision. The Court grants summary judgment to Defendant as to Plaintiff's claim of breach of the non-competition provision.[1]

The Court will also grant summary judgment to Defendant on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing as applied to the non-competition provision because the Court finds that Defendant acted in good faith by pursuing employment over 100 miles away from Raleigh. *See Consol. Generator-Nevada, Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998) (holding that good faith is a question of fact).

### ii. Breach of the Non-Solicitation Provision

Non-solicitation provisions are governed by NRS 613.195(2). The statute provides that an employer may not restrict a former employee from providing service to a former customer if: "(a) The former employee did not solicit the former customer or client; (b) The customer or client voluntarily chose to leave and seek services from the former employee; and (c) The former employee is otherwise complying with the limitations in the covenant." NRS 613.195(2)(a-c).

The Agreement provides that for 12 months following the termination of an employee's employment, the employee may not "attempt in any manner to solicit from any Customer . . . business of the type performed by Company or to persuade any Customer to cease to do business . . . with Company." (Agreement at § 2.1.) The definition of customer includes any person or entity who was a customer at the time of termination or in the one-year period immediately preceding termination. (Agreement at § 2.3.) The definition also includes some prospective customers. (*Id.*)

As written, the portion of the non-solicitation provision restricting

---

[1] Even if the Court enforced the provision as written and found Defendant in breach by virtue of his employment with EquipmentShare in Charlotte, there are still triable issues of fact precluding summary judgment on the issue of damages flowing from the breach. *See* Section III.1.a.ii. *infra.*

Defendant from engaging in certain activities complies with NRS 613.195(2). It only prohibits Defendant from attempting to solicit business from former customers or to persuade customers to cease to do business with Ahern. The statute allows restrictions on solicitation of former customers; what the statute prohibits are restrictions that prevent former employees from speaking with former customers, even if the customers contact the employee first. *See* NRS 613.195(2). This restriction does not conflict with the statute and is therefore valid and enforceable.

The Agreement's definition of "Customer," though, imposes a restraint that is greater than necessary for the protection of Plaintiff's interests. Again, Plaintiff assigns customers to its sales representatives and provides its employees with considerable amounts of confidential information and trade secrets about their assigned customers. (Ahern Rule 30(b)(6) Deposition at 12-15, 23, 33.) Sales representatives develop a rapport with specific entities, learn the intricacies of an entity's operations and its specific needs, and may service that entity in many cities across the country. (*Id.*) Plaintiff's business interests are focused on protection from ex-employees soliciting formerly assigned customers, using confidential information, rapport, and knowledge against Ahern that was gained from serving the customer on behalf of Ahern. Therefore, the non-solicitation provision need only restrict Defendant from soliciting customers that he had contacts with while at Ahern, not all Ahern customers, to adequately protect Plaintiff's business interests.

Similarly, an overbroad definition of "Customer" also places undue hardship on Defendant. As currently written, the restriction would require Defendant to confirm that every customer he reaches out to about equipment rentals while at his new company was not a "Customer" of Ahern's, even if Defendant himself had zero contact with the customer while employed at Ahern. With no established process to check on a potential customer's status with

Ahern, this restriction limits Defendant's ability to be gainfully employed as a commission-based sales representative. *See Golden Rd. Motor Inn, Inc.*, 376 P.3d at 155. Defendant's sales activities will be constantly undermined by fear of breaching the non-solicitation provision, and Defendant will not be able to rely on any personal knowledge to avoid a breach. Limiting the definition of "Customer" in the non-solicitation provision to customers that Defendant had contact with during his time at Ahern relieves the undue hardship on Defendant.

The Court therefore finds that the definition of "Customer" in the Agreement is overbroad and unenforceable and determines that it must revise the definition to eliminate the overbreadth. NRS 613.195(6). As explained above, an appropriate revision that is not greater than necessary to protect Plaintiff's business interests and relieves undue hardship on Defendant is to limit the definition of "Customer" to only include those customers that Defendant had personal contact with while at Ahern. The Court will thus revise Section 2.3 of the Agreement to include language limiting the definition of Customer to only include those customers of Ahern that fall under the current definition and "that Employee had personal contacts with while employed at Company."

The remaining question is whether there are triable issues of fact as to breach of the revised non-solicitation provision. Both Plaintiff and Defendant have pointed to facts in the record supporting their claims for summary judgment on breach of this provision. Defendant testified that during his time at EquipmentShare, he did business with three of his former customers at Ahern: Sky View Steel, MTZ Welding, and Cubas Welding. (Young First Deposition at 20-21.) Defendant further testified that he did not solicit any of these former customers and that each of them initiated contact. (*Id.* at 22-24.) To substantiate this claim, Defendant points to testimony from a Sky View Steel employee characterizing her interactions with Defendant as friendly, based on a

personal relationship, and not solicitous. (ECF No. 63-10 at 16-17.) Defendant further testified that the only other Ahern customer he contacted was Environmental Holdings Group ("EHG"); it is unclear from his testimony if that company was one of his former customers or just an Ahern customer. (Young First Deposition at 25-26.) Defendant stated that EHG initiated contact with him on his personal cell phone before he visited their office. (*Id.*)

Plaintiff identifies three additional companies that it claims Defendant solicited in violation of the non-solicitation provisions: Queens Welding, ARS Extreme Construction, and Phoinix Welding. In his deposition, Defendant disputed that Queens was a previous customer of his at Ahern. (*Id.* at 53-54.) Plaintiff submitted emails sent by Defendant to ARS Extreme Construction and Phoinix Welding that amount to solicitation. (ECF Nos. 67-34, 67-35.) Defendant has not pointed to no evidence in the record refuting that ARS Extreme Construction and Phoinix Welding are former customers or that Defendant initiated contact with them.

Plaintiff points to communications Defendant made to Ahern customers while at EquipmentShare and to subsequent orders with EquipmentShare to support its motion for summary judgment on breach of the non-solicitation provisions. For example, Plaintiff cites to communications and orders pertaining to Queens Welding, Cubas Welding, EHG, and Skyview Steel. (ECF Nos. 67-13–67-24.) Plaintiff cites similar communications and orders pertaining to MTZ Welding. (ECF Nos. 67-28–67-33.) And, as mentioned above, Plaintiff cites two emails from Defendant to ARS Extreme Construction and Phoinix Welding that amount to solicitation. (ECF Nos. 67-34, 67-35.)

Viewing the evidence in the light most favorable to each non-moving party and resolving all reasonable inferences in the non-moving party's favor, the Court finds triable issues of fact as to whether Defendant's communications and dealings with Queens Welding, Cubas Welding, EHG, Skyview Steel, and

MTZ Welding violated the revised non-solicitation provision. Specifically, the Court finds sufficient evidence in Defendant's testimony and the testimony of the Sky View Steel employee to establish triable issues of fact as to whether Defendant's communication with these customers amounted to solicitation, whether these customers contacted Defendant first, and whether these customers fit the revised definition of "Customer" in the non-solicitation agreement.

As to Defendant's communications and dealings with ARS Extreme Construction and Phoinix Welding, the Court finds that Defendant failed to point to evidence in the record refuting Plaintiff's claim that Defendant breached the non-solicitation provision in his dealings with these accounts. The Court therefore grants summary judgment to Plaintiff on the issue of breach as it pertains to these accounts only.

A breach of contract claim must also show "damage as a result of the breach." *Saini*, 434 F. Supp. 2d at 919–20 (citing *Richardson v. Jones*, 1 Nev. 405, 408 (1865)). Plaintiff has provided an expert report detailing a basis for calculating damages for Defendant's alleged breach of the non-solicitation provision. (ECF No. 63-9.) According to Plaintiff's expert, Plaintiff's total damages resulting from lost business Defendant obtained in violation of the non-solicitation provisions is at least $40,221. (*Id.*) This figure was calculated based on invoices Defendant generated on EquipmentShare's behalf for Sky View Steel, MTZ Welding, and Cubas Welding. (*Id.*) No damages were identified for Defendant's alleged solicitation of ARS Extreme Construction, Phoinix Welding, EHG, or Queens Welding. (*Id.*)

Defendant cites to deposition testimony from a Sky View Steel employee to argue that Plaintiff did nothing to maintain a business relationship with Sky View Steel following Defendant's departure from Ahern. (ECF No. 63-10 at 29, 57, 61.) Defendant also cites Ahern's Rule 30(b)(6) deposition testimony to show

1   that Plaintiff failed to specifically identify any efforts it made to rent equipment
2   to Cubas Welding and MTZ Welding following Defendant's departure from
3   Ahern. (Ahern Rule 30(b)(6) Deposition at 71-74.)

4        Viewing the evidence in the light most favorable to each non-moving party
5   and resolving all reasonable inferences in the non-moving party's favor, the
6   Court finds there are triable issues of fact as to whether Plaintiff suffered
7   damages as a result of Defendant's alleged breach of the non-solicitation
8   provision in his dealings with Sky View Steel, Cubas Welding, and MTZ
9   Welding.

10       The Court finds that there are no triable issues of fact as to damages for
11   Defendant's solicitation of ARS Extreme Construction and Phoinix Welding. The
12   Court also finds no triable issues of fact as to damages for Defendant's alleged
13   solicitation of EHG and Queens Welding. Plaintiff failed to identify any damages
14   for these breaches and alleged breaches, so the Court will grant summary
15   judgment to Defendant on the issues of damages for each of these claims.

16       After revising the non-solicitation provision to be valid and enforceable
17   and applying the revised agreement to the facts in the record, what remains are
18   triable issues of fact on Defendant's alleged breach of the non-solicitation
19   provision as to Defendant's dealings with Sky View Steel, Cubas Welding, and
20   MTZ Welding.

21       As to the surviving claims, because genuine issues of material fact exist
22   as to breach and damages, the Court also finds that there are genuine issues of
23   material fact precluding summary judgment on Plaintiff's claim for breach of
24   the implied covenant of good faith and fair dealing. *See Consol. Generator-*
25   *Nevada, Inc.*, 971 P.2d at 1256 (holding that when genuine issues of material
26   fact preclude summary judgment on breach, summary judgment on breach of
27   the implied covenant of good faith and fair dealing is correspondingly
28   precluded); *see also Tasty One, LLC v. Earth Smarte Water, LLC*, 2:20-cv-01625-

APG-NJK, 2022 WL 2110749, at *6 (D. Nev. June 9, 2022) (denying summary judgment on breach of implied covenant of good faith and fair dealing when "questions of fact remain regarding whether [Plaintiff] was damaged as a result").

### iii.  Breach of the Non-Disclosure Provision

"Employers commonly rely upon . . . nondisclosure . . . covenants, to safeguard important business interests." *Traffic Control Servs., Inc. v. United Rentals Nw., Inc.*, 87 P.3d 1054, 1057 (Nev. 2004) "The non-disclosure covenant limits the dissemination of proprietary information by a former employee." *Id.* (citing *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 917 (Pa. 2002)).

Neither party contests whether Defendant breached the non-disclosure provision in the Agreement. (Agreement at § 3.2.) Defendant admits that he retained Ahern information in his personal email account. (ECF No. 63 at 23.) This breaches Section 3.2 of the Agreement, even if Defendant is correct that none of the information constitutes confidential information or trade secrets. Defendant's argument for summary judgment is that Plaintiff has failed to establish damages flowing from the breach of the non-disclosure agreement. Defendant argues that because Plaintiff has failed to point to any specific evidence in the record showing that Defendant used Plaintiff's information in competition with Ahern, it cannot prove any damages resulting from the breach of the non-disclosure provision. Defendant also cites his deposition testimony denying ever using Ahern information in his employment at EquipmentShare. (Young First Deposition at 75.)

Plaintiff argues that it has provided expert testimony linking lost revenues to Defendant's sales activities with EquipmentShare. (ECF No. 63-9.) Plaintiff's expert opined that the Ahern customer information Defendant retained in violation of the Agreement held value to Defendant's goals as a sales representative for EquipmentShare and could have aided Defendant in

1    generating revenue for EquipmentShare. (*Id.*)

2         Viewing the evidence in the light most favorable to each non-moving party

3    and resolving all reasonable inferences in the non-moving party's favor, the

4    Court finds triable issues of fact as to whether Plaintiff suffered damages

5    because of Defendant's breach of the non-disclosure provision. Specifically, the

6    Court finds it reasonable to infer that Defendant may have relied on Ahern

7    information to aid him as a competitor at EquipmentShare. By the same token,

8    Defendant has pointed to his own deposition testimony refuting that inference.

9    The Court finds a triable issue of fact on whether Defendant used Ahern

10   information to aid in competition against Plaintiff, thus creating damages

11   because of the breach of the non-disclosure provision.

12        As above, because genuine issues of material fact exist as to damages, the

13   Court also finds that there are general issues of material fact precluding

14   summary judgment on Plaintiff's claim for breach of the implied covenant of

15   good faith and fair dealing related to the breach of the non-disclosure provision.

16   *Tasty One, LLC v. Earth Smarte Water, LLC*, 2:20-cv-01625-APG-NJK, 2022 WL

17   2110749, at *6 (D. Nev. June 9, 2022) (denying summary judgment on breach

18   of implied covenant of good faith and fair dealing when "questions of fact

19   remain regarding whether [Plaintiff] was damaged as a result").

20                        **b. Liquidated Damages**

21        The last question for the Court to address related to the terms of the

22   contract involves the Agreement's liquidated damages clause. (Agreement at §

23   5.) The clause provides that if Defendant "commits a breach or, in Company's

24   reasonable judgment, is about to commit a breach, of any of the provisions of

25   Section 2, 3 or 4 hereof, [Plaintiff] shall be entitled to: . . . (C) liquidated

26   damages in the amount of TWO HUNDRED FIFTY THOUSAND DOLLARS AND

27   00/100THS ($250,000)." (*Id.*) The section goes on to say that Plaintiff "shall be

28   entitled to such money damages insofar as they can be reasonably determined."

1    (*Id.*)

2    Liquidated damages provisions are presumed valid under Nevada law.

3    *Haromy v. Sawyer*, 654 P.2d 1022, 1023 (Nev. 1982). Liquidated damages

4    "serve as a good-faith effort to fix the amount of damages when contractual

5    damages are uncertain or immeasurable." *Khan v. Bakhsh*, 306 P.3d 411, 414

6    (Nev. 2013) "[T]he party challenging the provision must establish that its

7    application amounts to a penalty." *Haromy*, 654 P.2d at 1023. "In order to prove

8    a liquidated damage clause constitutes a penalty, the challenging party must

9    persuade the court that the liquidated damages are disproportionate to the

10   actual damages sustained by the injured party." *Id.*

11   In this case, Plaintiff is seeking at minimum $250,000 in liquidated

12   damages, and potentially $750,000, for Defendant's alleged breaches of the

13   Agreement. (ECF No. 63-9.) Under the terms of the Agreement, any liquidated

14   damages award is in addition to Plaintiff's right to pursue reasonably

15   determinable money damages. Here, Plaintiff hired an expert who calculated

16   Plaintiff's actual damages for Defendant's alleged breach to be $40,221. (ECF

17   No. 63-9.) The Court finds that a liquidated damages award in this case would

18   be disproportionate to the actual damages sustained by Plaintiff, as calculated

19   by its own expert. Even at the low end, the liquidated damage award would be

20   more than five times Plaintiff's actual damages. Such disproportion between a

21   liquidated damages clause and actual damages amounts to an unenforceable

22   penalty. *See Khan*, 306 P.3d at 414 (finding that a liquidated damages clause

23   awarding additional damages of "150% of actual damages" was an

24   unenforceable penalty for breach). The Court therefore grants Defendant

25   summary judgment on his affirmative defense related to this issue. (ECF No. 8

26   at ¶ 99.)

27        **c. Conversion**

28   Plaintiff's next claim is for conversion, alleging that when Defendant

26

violated the non-disclosure provision and emailed Ahern information to his personal email address, retained the information, and failed to return the information, that his actions amounted to conversion of Plaintiff's property. "Conversion is a distinct act of dominion wrongfully exerted over personal property in denial of, or inconsistent with, title or rights therein or in derogation, exclusion or defiance of such rights." *Edwards v. Emperor's Garden Rest.*, 130 P.3d 1280, 1287 (Nev. 2006) (citing *Wantz v. Redfield,* 326 P.2d 413 (Nev. 1958)). "Yet, conversion generally is limited to those severe, major, and important interferences with the right to control personal property that justify requiring the actor to pay the property's full value." *Edwards*, 130 P.3d at 1287 (citing Restatement (Second) of Torts § 222A (1965)).

Nevada case law, though, "does not suggest that the measure of damages is a part of the definition of conversion," nor does it "declare the full value of the property converted to be the sole measure of damages." *Bader v. Cerri*, P.2d 314, 317 (Nev. 1980), *overruled on other grounds by Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043 (2000). "A conversion occurs whenever there is a serious interference to a party's rights in his property." *Id.* "When this happens the injured party should receive full compensation for his actual losses." *Id.* "The party seeking damages has the burden of proving both the fact of damages and the amount thereof." *Mort Wallin of Lake Tahoe, Inc. v. Com. Cabinet Co.*, 784 P.2d 954, 955 (1989). "The latter aspect of the burden need not be met with mathematical exactitude, but there must be an evidentiary basis for determining a reasonably accurate amount of damages." *Id.*

Defendant argues that he is entitled to summary judgment on Plaintiff's claim for conversion because Plaintiff failed to establish an evidentiary basis for damages. Plaintiff argues that it should be granted summary judgment because it has established that Defendant exercised wrongful control over its property, and it has established damages caused by Defendant's misconduct.

Defendant does not contest Plaintiff's assertion that Defendant wrongfully retained Plaintiff's property. Defendant improperly emailed himself screenshots of customer information for every active Ahern customer in North Carolina that were taken from Ahern's password protected database. (First Young Deposition at 63-67, 75-77; ECF No. 67-7.) Defendant emailed several additional documents from Ahern's database throughout the course of March 2021. (ECF No. 67-8; ECF No. 67-9; ECF No. 67-10; ECF No. 67-11.) The Court therefore agrees with Plaintiff that Defendant converted Ahern information. The Court further finds that Plaintiff provided an evidentiary basis for damages in Hoffman's expert report. (ECF No. 63-9.) The Court, in line with its findings above on damages, finds that there are triable issues of fact on the issue of damages here, specifically on whether there is a causal link between Defendant's conversion of Ahern information and any actual damages identified by Hoffman in his report. *See Bader*, P.2d at 317 ("When [conversion] happens the injured party should receive full compensation for his actual losses."). Summary judgment is therefore denied to both parties on Plaintiff's claim for conversion.

### d. Nevada Trade Secrets Act

To establish misappropriation under the Nevada Uniform Trade Secrets Act ("NUTSA"), a plaintiff must show: "(1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose." *Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 958 (D. Nev. 2018) (citing *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000)).

The Court need not reach the second or third elements because it is satisfied that there is no genuine dispute of material fact on the first element.

28

"The determination of whether corporate information, such as customer and pricing information, is a trade secret is a question for the finder of fact." *Frantz*, 999 P.2d at 358. Factors to be considered include:

> (1) the extent to which the information is known outside of the business and the ease or difficulty with which the acquired information could be properly acquired by others; (2) whether the information was confidential or secret; (3) the extent and manner in which the employer guarded the secrecy of the information; and (4) the former employee's knowledge of customer's buying habits and other customer data and whether this information is known by the employer's competitors.

*Id.* at 358–59. "[N]ot every customer and pricing list will be protected as a trade secret." *Id.* at 359.

Trade secret is defined in the statute as "information, including, without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, prototype, procedure, computer programming instruction or code" that both "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." NRS 600A.030(5).

The undisputed facts do not support a finding that the customer information Defendant wrongfully retained amounts to a "trade secret" under NUTSA. The customer list Defendant emailed himself contained only names, addresses, and phone numbers, all of which can be found through public sources. (ECF No. 67-7.) It does not provide any specific contacts at the customer companies or any detailed information regarding customer needs, preferences, or characteristics. (*Id.*) Pricing information also lacks the necessary confidentiality to constitute a trade secret. Customers in the industry are not

1  prevented from sharing Ahern prices with competitors to obtain lower pricing.

2  (Foster Deposition at 135.) Thus, the first and second *Frantz* factors cut against

3  Plaintiff. While the third factor weighs in Plaintiff's favor because Plaintiff stores

4  its information in a secure, password protected database, the fourth factor also

5  weighs against Plaintiff because Defendant's knowledge of customer buying

6  habits can be easily acquired by competitors in the industry. Given all of these

7  factors, the Court finds that the customer lists, pricing information, and other

8  customer information are not trade secrets and therefore grants Defendant's

9  motion for summary judgment on Plaintiff's NUTSA claim.

10  **2. Summary Judgment on Defendant's Declaratory Judgment Claims**

11  Plaintiff has moved for summary judgment on Defendant's claims, which

12  include three claims for declaratory relief related to the validity and

13  enforceability of the non-competition and non-solicitation provisions and two

14  North Carolina state law claims. In his response brief, Defendant expressly

15  abandoned his state law claims, leaving only his claims for declaratory relief.

16  (ECF No. 77 at 2 n.1.)

17  Defendant brings his declaratory judgment claims under the North

18  Carolina Declaratory Judgment Act, N.C. Gen. Stat. § 1-253, *et seq.* (*Id.*) But

19  claims brought pursuant to North Carolina law are disallowed under the terms

20  of the Agreement, which provides that it "shall be governed by and construed in

21  accordance with the laws of the State of Nevada, without giving effect to its

22  choice of law provisions." (Agreement § 8.1.)

23  Defendant did not plead his claim for declaratory relief pursuant to either

24  Nevada or federal law. But even if Defendant did plead his claims under the

25  federal Declaratory Judgment Act, 28 U.S.C. § 2201, his claims would still be

26  improper because "the Declaratory Judgment Act provides an affirmative

27  remedy only when a cause of action otherwise exists." *City of Reno v. Netflix,*

28  *Inc.*, 52 F.4th 874, 876 (9th Cir. 2022). Because Defendant has expressly

30

abandoned all other causes of action, his claims for declaratory judgment are not tethered to any private right of action. Thus, the Court will grant Plaintiff's motion for summary judgment on Defendant's claims.

### 3. Motions to Seal

Three unopposed motions to seal are pending before the Court. (ECF Nos. 66, 69, 76.) Good cause appearing, the Court grants each of these motions to seal.

### 4. Motions to Supplement

Two opposed motions from Defendant for leave to file supplements to his summary judgment briefing are pending before the Court. (ECF Nos. 87, 88.) Local Rule 7-2(g) provides that, "[a] party may not file supplemental pleadings, briefs, authorities, or evidence without leave of court granted for good cause." "Good cause may exist either when the proffered supplemental authority controls the outcome of the litigation, or when the proffered supplemental authority is precedential, or particularly persuasive or helpful." *Urb. Outfitters, Inc. v. Dermody Operating Co., LLC*, 572 F. Supp. 3d 977, 984 (D. Nev. 2021) (quoting *Alps Prop. & Casualty Ins. C. v. Kalicki Collier, LLP*, 526 F. Supp. 3d 805, 812 (D. Nev. 2021)). If the arguments or authority which the moving party seeks to introduce are not binding or persuasive, the mere existence of those arguments or authority is not sufficient to establish good cause for the purposes of granting a request for leave to file a supplement pleading. *Greer v. Freemantle Productions,* 622 F. Supp. 3d 1010, 1015 (D. Nev. 2022).

Here, the proffered supplemental authority from the Arizona Court of Appeals is not precedential or binding. While it deals with similar facts as this case, the Court finds that it is not sufficiently persuasive or helpful to establish good cause for the purposes of granting Defendant's motions to supplement. The motions are therefore denied.

1

### IV.    Conclusion

2       IT IS THEREFORE ORDERED that Defendant's motion for summary

3   judgment (ECF No. 63) is GRANTED in part and DENIED in part consistent

4   with this Order.

5       IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment

6   (ECF No. 65) is GRANTED in part and DENIED in part consistent with this

7   Order.

8       IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment

9   (ECF No. 68) is GRANTED.

10       IT IS FURTHER ORDERED that the motions to seal in this case (ECF

11   Nos. 66, 69, 76) are each GRANTED.

12       IT IS FURTHER ORDERED that Defendant's motions to supplement (ECF

13   Nos. 87, 88) are each DENIED.

14

15       DATED THIS 5th day of March 2023.

16

17   _____

18   ANNE R. TRAUM
     UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28